FILED
CLERK, U.S. DISTRICT COURT

JUN - 6 2018

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

February 2018 Grand Jury

UNITED STATES OF AMERICA,

    Plaintiff,

    v.

JAMES IGNATIUS DIAMOND,
    aka "Jim Diamond," and
TRICIA MAE GRUBER,
    aka "Trish Gruber,"

    Defendants.

ED CR No. 1R- 18 CR 00172-AB

I N D I C T M E N T

[18 U.S.C. § 1341: Mail Fraud
Affecting a Financial Institution;
18 U.S.C. § 1343: Wire Fraud
Affecting a Financial Institution;
18 U.S.C. § 2: Aiding and
Abetting and Causing an Act to be
Done]

The Grand Jury charges:

COUNTS ONE THROUGH FIFTEEEN

[18 U.S.C. §§ 1341, 2]

A.    INTRODUCTORY ALLEGATIONS

Unless otherwise specified, at all times relevant to this Indictment:

1.    Defendant JAMES IGNATIUS DIAMOND, also known as ("aka") "Jim Diamond" ("DIAMOND"), resided in Riverside County, within the Central District of California. Defendant DIAMOND owned and operated businesses with offices located in Riverside County, including "Transmitting Assets, Inc." ("TAI"), "Operation Safe Haven," "Citizen

Beware," and "Unlimited Logistics Corporation" ("ULC") (collectively, "TAI/ULC"). TAI/ULC purported to offer debt-elimination services to homeowners who were behind on their mortgage payments and other debtors who were behind on their debt payments, including on car and student loans, in exchange for substantial fees, including an initial fee ("advance fee"), periodic program fees, and notary fees. Defendant DIAMOND was the owner, manager, secretary, treasurer, and president of TAI and the owner, manager, and president of ULC. Defendant DIAMOND maintained and was the signatory for a bank account at Bank of America, N.A. bearing an account number ending in X0666.

2. Defendant TRICIA MAE GRUBER, aka "Trish Gruber" ("GRUBER"), resided in Riverside County, within the Central District of California. Defendant GRUBER was notary public commissioned by California through December 25, 2012 and an office manager for TAI/ULC.

3. Bank of America, N.A. ("Bank of America"); CitiMortgage, Inc. ("CitiMortgage"); JPMorgan Chase Bank N.A. ("JPMorgan"); and HSBC Bank USA, N.A. ("HSBC") were each a financial institution engaged in the business of mortgage lending, and as such they were each a "financial institution" within the meaning of Title 18, United States Code, Section 20.

B.    THE SCHEME TO DEFRAUD

4. Beginning on a date unknown to the Grand Jury, but at least as early as in or about 2010, and continuing to in or about September 2014, in Riverside and San Bernardino Counties, within the Central District of California, and elsewhere, defendants DIAMOND and GRUBER, and others known and unknown to the Grand Jury, each aiding and abetting one another, knowingly and with intent to defraud, devised,

2

participated in, and executed, a scheme to defraud distressed homeowners and other debtors ("victim customers") as to material matters and to obtain money from victim customers by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts, which affected the financial institutions to which the victim customers owed money by exposing those financial institutions to an increased risk of loss.

C.   THE MANNER AND MEANS OF THE SCHEME TO DEFRAUD

5.   The fraudulent scheme operated, in substance, in the following manner:

a.   Defendants DIAMOND and GRUBER and their co-schemers induced homeowners and other debtors facing foreclosure or mortgage payments and other debt obligations that they could not meet to pay TAI/ULC advance fees, additional periodic fees, and notary fees for services that defendants DIAMOND and GRUBER falsely represented would eliminate the homeowners' and debtors' financial obligations.

b.   Defendants DIAMOND and GRUBER and their co-schemers recruited victim customers, many of whom did not speak English well or at all, through various means, including live seminars and presentations, as well as written marketing materials.

c.   Defendants DIAMOND and GRUBER and their co-schemers offered two primary methods of purported debt-elimination: (1) the "Diamond Home Reclamation Method," also known as the "Free and Clear Method" (the "Diamond Home Reclamation Method"), which targeted financially-distressed homeowners; and (2) the "Electronic Funds Transfer Program" ("Diamond EFT Program"), which targeted financially-distressed homeowners and financially-distressed victims with other debts such as car loans and student loans.

3

d.    Defendants DIAMOND and GRUBER, and their co-schemers falsely told victim customers that they did not have to continue paying their mortgages after entering into the programs and should instead pay TAI/ULC.  Defendant DIAMOND also falsely told victim customers that if they ceased making mortgage payments to their banks, the banks would be forced to settle with the victim customers.

e.    At least as early as 2010, defendants DIAMOND and GRUBER ignored correspondence they received from various financial institutions and government entities informing them that documents created by defendants DIAMOND and GRUBER and their co-schemers, which they submitted and directed the victim customers to submit to financial institutions that were victim customers' creditors had no legal effect, would not discharge any outstanding debts owing, and/or were fraudulent.

f.    When victim customers received similar correspondence from financial institutions and government entities and confronted defendants DIAMOND and GRUBER and their co-schemers with this correspondence or requested refunds, defendants DIAMOND and GRUBER ignored them, claimed that the correspondence was part of the debt-elimination process, encouraged the victim customers to pay purported outstanding fees to TAI/ULC so that their debts would be successfully eliminated, or offered to enroll the victim customers in other services for additional fees.

g.    After paying TAI/ULC for services, some victim customers received unlawful detainer notices, notices of trustee sale, and other foreclosure-related documents.  Some victim customers lost their properties.  When victim customers complained to defendants DIAMOND and GRUBER about these foreclosure-related

4

developments, defendants DIAMOND and GRUBER would ignore them or offer to enroll the victim customers in other services for additional fees.

h.    Defendants DIAMOND and GRUBER and their co-schemers did not comply with state laws and regulations that govern, and in some cases prohibit, the operation of advance fee loan modification businesses.

Diamond Home Reclamation Method

i.    To participate in the Diamond Home Reclamation Method, defendants DIAMOND and GRUBER and their co-schemers generally required victim customers to pay an advance fee ranging from $3,500 to $8,000 per property, plus additional fees per lien on the property, periodic program fees, and notary fees.

j.    After victim customers paid an advance fee, defendants DIAMOND and GRUBER and their co-schemers directed the victim customers to travel to the TAI/ULC office in Riverside, California, to provide TAI/ULC employees with information relating to the victim customers' debt obligations.  At the TAI/ULC office, defendants DIAMOND and GRUBER and their co-schemers directed the victim customers to sign various documents that purported to eliminate the victim customers' debts when sent to financial institutions, including banks and mortgage companies, and government agencies, entities, and officials (the "Documents").

k.    Defendant GRUBER generally notarized the Documents and charged a fee for each document that she notarized, typically between $50 and $300 per document, which was well above the prevailing market rate.

5

l.    Defendants DIAMOND and GRUBER and their co-schemers provided some of the Documents to the victim customers and instructed them to mail the Documents to various entities.  Defendants DIAMOND and GRUBER and their co-schemers also filed some of the Documents with county recorders' offices for additional fees.

m.    In furtherance of this part of the scheme, defendants DIAMOND and GRUBER and their co-schemers made and caused others to make the following material false and fraudulent pretenses, representations, and promises:

i.    That victim customers who paid for the Diamond Home Reclamation Method would eliminate their mortgages entirely and own their residences "free and clear," when in truth and in fact, as defendants DIAMOND and GRUBER and their co-schemers then well knew, the Diamond Home Reclamation Method would not eliminate victim customers' mortgages entirely or allow them to own their residences "free and clear."

ii.    That the Diamond Home Reclamation Method had successfully eliminated debt obligations, when in truth and in fact, as defendants DIAMOND and GRUBER and their co-schemers when well knew, the Diamond Home Reclamation Method had successfully not eliminated debt obligations.

iii. That the Documents that defendants DIAMOND and GRUBER and their co-schemers had the victim customers sign and send to financial institutions and government agencies would result in the elimination of the victim customers' debts, when, in truth and in fact, as defendants DIAMOND and GRUBER and their co-schemers then well knew, the Documents would not eliminate any debt obligations and had no legal effect at all.

6

iv.    That victim customers were not legally obligated to continue to pay their mortgages, when in truth and in fact, as defendants DIAMOND and GRUBER and their co-schemers then well knew, the Diamond Home Reclamation Method did not relieve the victim customers of their obligations to pay their mortgages.

v.    That correspondence received from various financial institutions stating that the Documents created by defendants DIAMOND and GRUBER and their co-schemers had no legal effect, would not discharge any outstanding debts owing, and/or were fraudulent actually were part of the debt-elimination process, when in truth and in fact, as defendants DIAMOND and GRUBER and their co-schemers then well knew, the letters were not part of a process that would eliminate any debt obligations.

n.    Also in furtherance of this part of the scheme, defendants DIAMOND and GRUBER knowingly concealed the following material facts from the victim customers:

i.    That the Documents had no legal effect.

ii.    That the Diamond Home Reclamation Method never had succeeded in eliminating a customer's mortgage obligation.

Diamond Electronic Fund Transfer Program

o.    To participate in the Diamond EFT Program, defendants DIAMOND and GRUBER and their co-schemers generally required victim customers to pay a fee, which they calculated as a percentage, typically 13%, of the amount of the debt to be discharged, plus additional program fees and notary fees.  The victim customers were required to pay an advance fee, typically several thousand dollars, followed by monthly payments and notary fees.  Defendant DIAMOND

sometimes also recorded liens on the victim customers' properties in the amount of the fee.

p.     After victim customers paid the advance fee, defendants DIAMOND and GRUBER and their co-schemers directed the victim customers to provide TAI/ULC employees with information relating to the victim customers' debt obligations.

q.     After victim customers paid the advance fee, defendant DIAMOND prepared and directed to be prepared, among other documents, documents that appeared to be checks in the name of "JAMES I. DIAMOND," made payable to the victims' financial institution creditors in the amounts of the balances owed on the victim customer debt obligations (the "EFT Checks"). The memoranda lines on the EFT Checks bore the words, "FOR EFT ONLY FOR THE DISCHARGE OF DEBT," or similar words. Defendants DIAMOND and GRUBER and their co-schemers then provided the EFT Checks to the victim customers and instructed the victim customers to mail the EFT Checks to their financial institution creditors and other entities as purported payments satisfying the outstanding balances owed by the victim customers.

r.     Defendant GRUBER generally notarized documents relating to the EFT process and charged a fee for each document that she notarized, typically between $50 and $300 per document, which was well above the prevailing market rate.

s.     When victim customers advised defendants DIAMOND and GRUBER that their financial institutions had rejected the EFT checks, defendant DIAMOND falsely told the victim customers that this was part of the debt-elimination process and that customer victims were required to continue making monthly payments to TAI/ULC in the amount of 13% of the amount of the debt obligation.

t.   If a victim customer stopped paying the monthly payments, defendant DIAMOND would: (1) advise the victim customer that the debt-elimination process would not work until s/he had completed all payments; (2) threaten to foreclose on the victim customer's property or other assets; and (3) threaten to assess late fees.

u.   In furtherance of this part of the scheme, defendants DIAMOND and GRUBER and their co-schemers made and caused others to make the following material false and fraudulent pretenses, representations, and promises:

i.   That victim customers who paid for the Diamond EFT Program would be able to discharge or entirely eliminate their debt obligations, including home mortgages, car loans, and student loans, when in truth and in fact, as defendants DIAMOND and GRUBER and their co-schemers then well knew, the Diamond EFT Program would not discharge or entirely eliminate victim customers' debt obligations.

ii.   That EFT Checks were valid, legal tender, drawn on open bank accounts, when in truth and in fact, as defendants DIAMOND and GRUBER and their co-schemers then well knew, the EFT Checks were not valid, legal tender, and were not drawn on open bank accounts.

iii. That EFT Checks would pay off the victim customers' debts, when in truth and in fact, as defendants DIAMOND and GRUBER and their co-schemers then well knew, the EFT Checks would not pay off the victim customers' debts.

iv.   That the financial institutions' rejection of the EFT checks was part of the debt-elimination process, when in truth

and in fact, as defendants DIAMOND and GRUBER and their co-schemers then well knew, the financial institutions' rejection of the EFT Checks was not part of a process that would eliminate any debt obligations.

v. Also in furtherance of this part of the scheme, defendants DIAMOND and GRUBER knowingly concealed the following material facts from the victim customers:

i. That the EFT Checks were not valid, legal tender, and instead contained account numbers belonging to closed bank accounts.

ii. That the EFT Checks had never succeeded in eliminating a customer's debt obligation.

6. As a result of the fraudulent scheme, defendants DIAMOND and GRUBER induced hundreds of distressed homeowners and other debtors to pay more than $1.5 million in fees to TAI/ULC.

D. USE OF THE MAILS

7. On or about the dates set forth below, in Riverside and San Bernardino Counties, within the Central District of California, and elsewhere, defendants DIAMOND and GRUBER and their co-schemers, each aiding and abetting one another, for the purpose of executing the above-described scheme to defraud, willfully caused the following items to be placed in an authorized depository for mail matter to be delivered by the United States Postal Service according to the directions thereon:

| COUNT | DATE | ITEM MAILED |
| --- | --- | --- |
| ONE | 5/4/2011 | A document entitled "Affidavit of Obligation Commercial Lien" addressed to Sanjiv Das, President and CEO of Citimortgage, in O'Fallon, Missouri, sent from San Bernardino, California on behalf of victim S.B. |

| COUNT | DATE | ITEM MAILED |
|---|---|---|
| TWO | 6/9/2011 | A document entitled "Non-Negotiable Notice of Fault in Dishonor and Opportunity to Cure" addressed to Citimortgage, in O'Fallon, Missouri, sent from Riverside, California on behalf of victim S.B. |
| THREE | 6/29/2011 | A document entitled "Notice of Default in Dishonor, Discharge of Obligation to Pay Instrument and Demand of Reconveyance and Release of Lien" addressed to Citimortgage, in O'Fallon, Missouri, sent from Riverside, California on behalf of victim S.B. |
| FOUR | 8/23/2011 | A document entitled "Notice of Default" and "Notice of Right to Cancel Letter" addressed to Orange Coast Title Company in Santa Ana, California, sent from Riverside, California on behalf of victim S.B. |
| FIVE | 8/23/2011 | A document entitled "Notice of Default" and "Notice of Right to Cancel Letter" addressed to Sanjiv Das, CEO, dba Citimortgage, in O'Fallon, Missouri, sent from Riverside, California on behalf of victim S.B. |
| SIX | 7/8/2011 | A document entitled "Affidavit of Obligation Commercial Lien" addressed to Ralph A. Lenzi, CEO dba Aurora Loan Services LLC, in Littleton, Colorado, sent from San Bernardino, California on behalf of victims R.W. and D.W. |
| SEVEN | 7/8/2011 | A document entitled "Affidavit of Obligation Commercial Lien" addressed to James Dimon, Chairman and CEO dba JP Morgan Chase, in Columbus, Ohio, sent from San Bernardino, California on behalf of victims R.W. and D.W. |
| EIGHT | 7/25/2011 | A document entitled "Non-Negotiable Notice of Fault in Dishonor and Opportunity to Cure" addressed to Ralph A. Lenzi, CEO dba Aurora Loan Services LLC, in Littleton, Colorado, sent from San Bernardino, California on behalf of victims R.W. and D.W. |
| NINE | 7/25/2011 | A document entitled "Non-Negotiable Notice of Fault in Dishonor and Opportunity to Cure" addressed to James Dimon, Chairman and CEO dba JP Morgan Chase, in Columbus, Ohio, sent from San Bernardino, California on behalf of victims R.W. and D.W. |

11

| COUNT | DATE | ITEM MAILED |
|---|---|---|
| TEN | 8/9/2011 | A document entitled "Affidavit of Obligation Commercial Lien" addressed to HSBC Bank USA, N.A., dba Luminent Mortgage Trust 2006-6, in New York, New York, sent from Riverside, California on behalf of victims R.W. and D.W. |
| ELEVEN | 8/10/2011 | A document entitled "Non-Negotiable Notice of Fault in Dishonor, Discharge of Obligation to Pay Instrument and Demand for Reconveyance and Release of Lien" addressed to James Dimon, Chairman and CEO dba JP Morgan Chase, in Columbus, Ohio, sent from Riverside, California on behalf of victims R.W. and D.W. |
| TWELVE | 8/22/2012 | A document for "EFT Discharge," purporting to be a check, in the amount of $156,256.56 payable to Bank of America, in Greensboro, North Carolina, sent from Corona, California on behalf of victim P.G. |
| THIRTEEN | 8/22/2012 | A document for "EFT Discharge," purporting to be a check, in the amount of $60,945.44 payable to the United States Treasury, in Fresno, California, sent from Corona, California on behalf of victim P.G. |
| FOURTEEN | 8/22/2012 | A document for "EFT Discharge," purporting to be a check, in the amount of $12,240.28 payable to the United States Treasury, in Fresno, California, sent from Corona, California on behalf of victim P.G. |
| FIFTEEN | 8/22/2012 | A document for "EFT Discharge," purporting to be a check, in the amount of $664,019.85 payable to the JP Morgan Chase Bank, N.A., in Monroe, Louisiana, sent from Corona, California on behalf of victim P.G. |

COUNTS SIXTEEN THROUGH THIRTY

[18 U.S.C. §§ 1343, 2]

8.    The Grand Jury incorporates by reference and re-alleges Paragraphs 1 through 6 of this Indictment as though set forth in their entirety here.

A.    USE OF INTERSTATE WIRE COMMUNICATIONS

9.    On or about the dates set forth below, in Riverside County, within the Central District of California, and elsewhere, defendants DIAMOND and GRUBER and their co-schemers, each aiding and abetting one another, for the purpose of executing the above-described scheme to defraud, caused and aided and abetted in the transmission of the following items by means of wire communication in interstate and foreign commerce:

| COUNT | DATE | ITEM WIRED |
| --- | --- | --- |
| SIXTEEN | 10/1/12 | Mobile deposit of $1,195 check from victim G.H.W., via Bank of America servers in Virginia, into Bank of America account xxxx0666 in the Central District of California ("CDCA") |
| SEVENTEEN | 10/5/12 | Mobile deposit of $1,035 check from victim P.G., via Bank of America servers in Virginia, into Bank of America account xxxx0666 in CDCA |
| EIGHTEEN | 10/9/12 | Mobile deposit of $1,475 check from victim J.S., via Bank of America servers in Virginia, into Bank of America account xxxx0666 in CDCA |
| NINETEEN | 11/13/12 | Mobile deposit of $1,475 check from victim J.S., via Bank of America servers in Virginia, into Bank of America account xxxx0666 in CDCA |
| TWENTY | 11/16/12 | Mobile deposit of $1,000 check from victim P.G., via Bank of America servers in Virginia, into Bank of America account xxxx0666 in CDCA |

13

| COUNT | DATE | ITEM WIRED |
|---|---|---|
| TWENTY-ONE | 11/21/12 | Mobile deposit of $1,035 check from victim P.G., via Bank of America servers in Virginia, into Bank of America account xxxx0666 in CDCA |
| TWENTY-TWO | 11/29/12 | Mobile deposit of $1,200 check from victim G.H.W., via Bank of America servers in Virginia, into Bank of America account xxxx0666 in CDCA |
| TWENTY-THREE | 12/11/12 | Mobile deposit of $1,475 check from victim J.S., via Bank of America servers in Virginia, into Bank of America account xxxx0666 in CDCA |
| TWENTY-FOUR | 2/7/13 | Mobile deposit of $1,200 check from victim G.H.W., via Bank of America servers in Virginia, into Bank of America account xxxx0666 in CDCA |
| TWENTY-FIVE | 3/5/13 | Mobile deposit of $630 check from victim G.H.W., via Bank of America servers in Virginia, into Bank of America account xxxx0666 in CDCA |
| TWENTY-SIX | 4/5/13 | Mobile deposit of $750 check from victim G.H.W., via Bank of America servers in Virginia, into Bank of America account xxxx0666  in CDCA |
| TWENTY-SEVEN | 4/15/13 | Mobile deposit of $1,941.54 check from victim J.S., via Bank of America servers in Virginia, into Bank of America account xxxx0666 in CDCA |
| TWENTY-EIGHT | 5/8/13 | Mobile deposit of $1,195 check from victim G.H.W., via Bank of America servers in Virginia, into Bank of America account xxxx0666 in CDCA |

| COUNT | DATE | ITEM WIRED |
|---|---|---|
| TWENTY-NINE | 6/6/13 | Mobile deposit of $750 check from victim G.H.W., via Bank of America servers in Virginia, into Bank of America account xxxx0666 in CDCA |
| THIRTY | 6/7/13 | Mobile deposit of $880 check from victim M.H., via Bank of America servers in Virginia, into Bank of America account xxxx0666 in CDCA |

A TRUE BILL

/S/
_____
Foreperson

TRACY L. WILKINSON
Attorney for the United States,
Acting Under Authority Conferred
by 28 U.S.C. § 515

*Scott Garringer —
Deputy Chief, Criminal Division For:*

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division

RANEE A. KATZENSTEIN
Assistant United States Attorney
Chief, Major Frauds Section

KRISTEN WILLIAMS
Assistant United States Attorney
Deputy Chief, Major Frauds Section

CASSIE D. PALMER
Assistant United States Attorney
Major Frauds Section

15